Filed 4/30/15  P. v. Manriquez CA5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>IVAN ANTONIO MANRIQUEZ et al.,<br><br>Defendants and Appellants. | F066348, F066358<br><br>(Super. Ct. Nos. MF008656A,<br>MF008656B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael E. Dellostritto, Judge.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant Ivan A. Manriquez.

Harry I. Zimmerman, under appointment by the Court of Appeal, for Defendant and Appellant Perry R. Avila.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Marcia A. Fay, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## *INTRODUCTION*

Perry R. Avila and Ivan A. Manriquez (collectively, appellants) were prison inmates serving life sentences, when they entered the programs office at the prison facility where they were incarcerated and stabbed three correctional officers with inmate-manufactured weapons known as shanks. After being jointly tried before separate juries, Avila was convicted of one count of attempted voluntary manslaughter and two counts of misdemeanor assault, and Manriquez was convicted of three counts of assault with a deadly weapon or by means of force likely to produce great bodily injury by a prisoner serving a life sentence (hereafter, aggravated assault by a life prisoner). Appellants appealed their convictions and the appeals have been consolidated.

Appellants raise numerous contentions on appeal, the majority of which we reject for reasons discussed below. However, we agree with Manriquez's contention, which the People concede, that his abstract of judgment must be amended because it incorrectly reflects that he was sentenced to life without the possibility of parole for his convictions. We further conclude that a one-year sentence enhancement imposed based on Manriquez's use of a deadly or dangerous weapon must be stricken because his use of a deadly weapon was an element of the underlying offense. In all other respects, we affirm the convictions and findings against appellants.

## *FACTUAL AND PROCEDURAL BACKGROUND*

### *Prosecution Facts Presented to Both Juries*

The underlying incident occurred on April 3, 2008, at the California Corrections Institution in Tehachapi (hereafter, Tehachapi). Around 1:00 p.m., the three victims—Humberto Silva, Michael Slankard, and Steven Cacciola—were busy doing paperwork in the programs office located next to the inmates' law library, when appellants surprised the correctional officers by entering the office and attacking them with shanks. Avila stabbed Cacciola twice in the neck and then stabbed Silva numerous times in the face,

2.

head, neck, ribs, shoulder, and spine.  Manriquez stabbed Slankard in the back of the neck.

### Prosecution Facts Presented to Manriquez's Jury Only

During interviews conducted in the days following the April 3, 2008, incident, Manriquez told investigators that, a short time before the incident, Avila came into the law library, where Manriquez was working as a clerk, and provided Manriquez with a code-word for retrieving the two shanks used in the attack, which were then hidden in the leg of a desk at the back of the library.

Although Manriquez initially denied any knowledge of the hidden weapons before Avila told him where to find them, Manriquez eventually admitted that he hid the shanks in the desk leg about a month prior to the incident.  Manriquez also identified two inmates he claimed were involved in making the shanks and giving them to him to hide.

After Manriquez handed Avila the two shanks, Avila handed one back, explaining that he had received directions from the Mexican Mafia prison gang to assault correctional staff and that he needed Manriquez to assist him.  Avila then asked Manriquez to follow him out of the library and Manriquez complied with Avila's request.

When describing these events to investigators, Manriquez explained that he and Avila were from the same county and "it's understood by all … Hispanic inmates that are familiar with the Mexican Mafia's philosophy, that … if you don't follow a direct order from the Mexican Mafia, you will be targeted for an assault."

David Perez, one of the investigators who interviewed Manriquez, testified that, based on his training and experience, he understood Manriquez to mean that "[i]f this was a real order that came from the Mexican Mafia, and he was tasked with assaulting staff and he chose not to, then he was going to be on a list to be assaulted, to be stabbed."

After Manriquez followed Avila out of the law library, they started walking towards the "Receiving & Release" area of the prison, which was where Avila initially said they would be going.  On their way there, however, they saw a female officer open

3.

the door to the programs office. In that moment, Avila changed his plan and said to Manriquez: "'Follow me. If she gets in the way, just push her out of the way.'"

According to Manriquez, after he followed Avila into the programs office, "Avila went directly for Silva" and started stabbing the correctional officer in his neck and shoulder area approximately five times. When asked what he did when he saw Avila stabbing Silva, Manriquez said he "stabbed those that were responding to help Avila" and recalled stabbing two officers approximately three times.

When questioned about whether he had any prior knowledge concerning the plan to assault officers, Manriquez initially claimed he only knew about it a couple minutes beforehand, after Avila asked for his help. Manriquez later admitted that prior to the incident, he had heard "talk … on the yard about something that was going to go down, which usually means an assault." Manriquez explained he did not know specific details but had heard "some Hispanic inmates … were being asked to conduct an assault and, apparently, they refused" and "word was out that those who refused to participate would then be targeted for assault."

As mentioned above, Manriquez eventually admitted that he hid the weapons in the law library himself and identified other inmates he claimed were involved with the weapons. Manriquez maintained that he believed the order to assault the correctional officers came from the Mexican Mafia, and said he thought the order originated at Pelican Bay State Prison.

In their interviews with Manriquez, investigators attempted to gather information about why the attack on April 3, 2008, occurred. Manriquez did not provide any specific reasons for the attack, but when asked about his perception of possible problems on the yard, Manriquez mentioned a few issues without going into detail. Those issues included "602's" (i.e., the administrative procedures for inmates to challenge rules, regulations, and conditions in prison), inmates' perception that staff in "R & R" (i.e., the receiving & release area) deliberately withheld or delayed distribution of inmates' personal property,

4.

and the "general consensus" of inmates that staff exhibited "disrespect" towards prisoners on the yard.

### *Defense Facts Presented to Both Juries*

Avila testified on his own behalf, admitting he stabbed Silva multiple times but claiming to have done so in self-defense. Contrary to the officers' accounts of appellants engaging in a surprise attack, Avila claimed Silva specifically summoned him into the programs office that afternoon, after first having Avila sent up to the law library by a guard in Avila's building.

Avila, who was not signed up to use the library that day, was suspicious that Silva might be planning to harm him in retaliation for Avila's advocacy on behalf of Hispanic inmates as a Men's Advisory Committee (MAC) representative. Therefore, Avila claimed, it was solely for his self-protection that he used the code-word to get the shanks from Manriquez when he first arrived at the library. Avila claimed "somebody sympathetic to what was going on" had previously told him the weapons were available and instructed him on how to retrieve them.

In his testimony, Avila described at length how, as a MAC representative, he frequently presented issues to Silva and Slankard on behalf of Hispanic inmates—whom Avila claimed were particularly discriminated against at Tehachapi—and how his advocacy efforts, which included filing numerous administrative appeals, had rankled Silva and Slankard. According to Avila, the administration at Tehachapi, and Slankard in particular, was hostile towards "[t]he administrative appeals process otherwise known as the 602 process."

As an example, Avila described his first encounter with Slankard, which occurred after Avila filed an administrative appeal challenging the prison's alleged practice of providing inmates with mattresses but not pillows. Slankard allegedly responded by berating Avila for filing the appeal instead of pursuing informal channels to resolve the issue, which was how Slankard asserted things were done at Tehachapi. Slankard then

5.

threw a pillow at Avila, who, foreseeing Slankard might do this to humiliate him, had already readied himself to catch it.

While admitting Silva and Slankard never laid their hands on him or threatened to do so, Avila testified that, sometime between the end of 2007 and the beginning of 2008, both officers made threats to have him transferred to Pelican Bay State Prison "where they had people that would make my life miserable." When Silva summoned him to the law library on the afternoon of April 3, 2008, Avila sensed that things were "coming to a head" between him and the two officers.

According to Avila, Silva and Slankard viewed him as an agitator and were aggravated by two issues Avila had recently been pressing, namely his complaints that Hispanic inmates were being discriminated against by being subjected to a disproportionate number of lockdowns compared to inmates of other racial groups, which was also the subject of a federal lawsuit he filed, and his complaints challenging the participation of female officers in strip searches, an issue Silva and Slankard reportedly regarded as a matter of office politics not concerning Avila.

It was against this backdrop of alleged hostility on the part of Silva and Slankard Avila claimed that Silva summoned him to the programs office about 15 minutes after Avila's arrival in the law library. Avila testified that Silva summoned him by opening the door between the programs office and library and saying, "get in here."

Avila, who had already asked Manriquez to watch his back, told Manriquez he was going to enter the programs office and for Manriquez to make sure he (Avila) did not get pushed out of the office onto the prison yard. Avila explained that the tower guards on the yard were always armed with rifles and would automatically target prisoners who appeared to be fighting with staff.

Avila went into the programs office followed by Manriquez. When Avila entered the office, he saw Slankard, Silva, and a third officer, whom he did not recognize, standing with their batons out by their sides. Sensing "things were coming to the head

6.

that [he had] anticipated" and that he needed to defend himself, Avila took his weapon out of his pocket. When Avila took out his weapon, Slankard started yelling "hey" and moving towards him.

Avila moved to his right to avoid Slankard and someone hit Avila in the head with a baton. Avila and Silva then got "tangled up and started to fight." Avila explained Silva grabbed and started punched him. Avila started stabbing Silva to try to get away from the officer. Silva would not let go, Avila testified, but continued punching and "dragging me into walls."

Although Avila could not remember stabbing Cacciola in "the melee," Avila acknowledged it was possible because there were "a lot of bodies moving around in [a] small space fighting."

### *Charges, Verdicts, and Sentencing*

On October 15, 2012, the district attorney filed an amended information charging appellants with the attempted premeditated murders of Silva, Slankard, and Cacciola in counts 1, 2, and 3, and including corresponding charges of aggravated assault by a life prisoner in counts 4, 5, and 6. (Pen. Code,[1] §§ 664, 187, 189, 4500.) The amended information further alleged that Avila personally inflicted great bodily injury and personally used a deadly or dangerous weapon in the commission of counts 1, 3, 4, and 6, and that Manriquez personally used a deadly or dangerous weapon in the commission of counts 2 and 5. (§§ 12022.7, 12022, subd. (b)(1)). Avila was alleged to have suffered six prior strike convictions and six prior serious felony convictions, and Manriquez was alleged to have suffered two prior strike convictions and two prior serious felony convictions. (§§ 667, subds. (a)-(e), 1170.12.)

After their joint trial before separate juries, appellants were each convicted of three offenses. On November 7, 2012, Avila was convicted of the lesser included offense

---

[1] Further statutory references are to the Penal Code unless otherwise specified.

of attempted voluntary manslaughter in count 1, and the lesser included offense of misdemeanor assault in counts 4 and 6. The jury also found true the section 12022.7 and section 12022, subdivision (b)(1) enhancements in count 1. The jury acquitted Avila of counts 2 and 5, and the trial court declared a mistrial on count 3, after the jury was unable to reach a verdict as to that count. The trial court dismissed one of the prior strike and prior serious felony allegations, and found the remaining prior conviction allegations to be true. On December 11, 2012, the court sentenced Avila to a total indeterminate prison term of 34 years six months to life, plus a total determinate term of 29 years.

On November 13, 2012, the jury convicted Manriquez of aggravated assault by a life prisoner in counts 4 through 6, and found the section 12022, subdivision (b)(1) enhancement in count 5 to be true. The jury acquitted him of counts 1 through 3. Manriquez admitted the prior conviction allegations and, on December 11, 2012, the trial court sentenced him to a total indeterminate term of 81 years to life, plus a total determinate term of 16 years.

## *DISCUSSION*

### I.      *The Parties' Contentions on Appeal*

Manriquez raises four issues on appeal and joins in the arguments raised by Avila to the extent they are beneficial to him. First, Manriquez contends the trial court likely abused its discretion and violated his due process right to a fair trial by failing to order the disclosure of exculpatory material in violation of *Brady v. Maryland* (1963) 373 U.S. 83, 87 (*Brady*), and requests that this court independently review the sealed records of the in camera proceedings conducted by the trial court regarding certain California Department of Corrections and Rehabilitation (CDCR) documents sought during discovery to determine whether they contain undisclosed *Brady* material relevant to his defense of duress. Second, Manriquez contends the trial court erred in failing to instruct the jury sua sponte on the lesser included offense defined in section 245, subdivision (a)(1). Third, he contends the court erred in imposing a $240 restitution fine. Finally, he

contends the abstract of judgment must be corrected to reflect the consecutive life terms imposed for his convictions of aggravated assault by a life prisoner include the possibility of parole.

Avila joins in two of Manriquez's issues and raises four of his own. Specifically, Avila joins Manriquez's first issue and requests that we review the sealed records from the in camera proceedings to determine whether there is undisclosed *Brady* material relevant to his self-defense claim (the People also join appellants' request that this court conduct an independent review of the sealed records). In addition, Avila joins Manriquez's third issue, contending the trial court erroneously imposed a $240 restitution fine. He further contends the trial court erred in denying his pretrial motion to replace trial counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), the court erred in responding to a jury note regarding the meaning of "moral turpitude," and the court erred in denying the defense motion to continue trial for purposes of investigating four inmates Manriquez mentioned during his interviews with investigators shortly after the April 3, 2008, incident. Finally, Avila contends the cumulative effect of the alleged errors requires reversal of his convictions.

As mentioned above, we agree with Manriquez's fourth contention and will order the abstract of judgment to be amended to reflect that his sentence includes the possibility of parole. Our review has also uncovered an error not addressed in the parties' original briefing on appeal. Specifically, the trial court improperly imposed the one-year section 12022, subdivision (b)(1) enhancement in count 5, because Manriquez's use of a deadly weapon was an element of the underlying offense of aggravated assault by a life prisoner and therefore the enhancement must be stricken. We reject appellants' remaining contentions.

## II.     *Manriquez's Issues*

### A.     *No undisclosed Brady material*

At the parties' request, we have examined the sealed records from the in camera proceedings regarding the CDRC documents at issue and have determined they reveal no previously undisclosed *Brady* material subject to disclosure.

### B.     *Failure to instruct on lesser included offense*

Manriquez contends the trial court erred in violation of his due process right to a fair trial by failing to instruct the jury sua sponte on the lesser included offense of assault with a deadly or dangerous weapon or by means of force likely to produce great bodily injury (§ 245, subd. (a)(1); hereafter, aggravated assault), and the error requires reversal of his convictions for aggravated assault by a life prisoner. We disagree.

"A criminal defendant is entitled to an instruction on a lesser included offense only if [citation] 'there is evidence which, if accepted by the trier of fact, would absolve [the] defendant from guilt of the greater offense' [citation] but not the lesser. [Citations.]" (*People v. Memro* (1995) 11 Cal.4th 786, 871.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could ... conclude[]"' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) If substantial evidence exists, the trial court has a sua sponte duty to give the instruction, even if the evidence supporting the lesser offense is inconsistent with the accused's defense. (*People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1016-1017.)

Manriquez is correct in arguing that aggravated assault (§ 245, subd. (a)(1)) is a necessarily included offense of aggravated assault by a life prisoner (§ 4500). (*People v. Milward* (2011) 52 Cal.4th 580, 588-589.) The difference between the two is that

10.

aggravated assault "requires only general intent and does not require intent to harm" while aggravated assault by a life prisoner requires "malice aforethought." (*People v. Jeter* (2005) 125 Cal.App.4th 1212, 1217.) "Malice aforethought as used in section 4500 has the same meaning as it has for murder convictions, requiring either an intent to kill or 'knowledge of the danger to, and with conscious disregard for, human life.' [Citations.]" (*Id.* at p. 1216.)

Manriquez asserts that the trial court had a sua sponte duty to instruct on the lesser included offense of aggravated assault because the jury could have reasonably found that, while Avila harbored malice aforethought in assaulting the correctional officers, he did not. Manriquez asserts his statements to investigators that he believed he would be targeted for assault if he refused to help Avila, coupled with evidence he inflicted only *slight* injuries to Slankard, demonstrate he did not act with the same *enthusiasm* as Avila during the assault.

When viewed in context, none of the circumstances identified by Manriquez constitute substantial evidence that he acted without malice aforethought in assaulting the officers. There is no indication in the record that Manriquez exhibited any hesitation or exercised any restraint after he agreed to help Avila assault correctional officers. Armed with one of the shanks he himself had previously hidden, Manriquez followed Avila into the programs office and, after seeing Avila repeatedly stab Silva in the neck and shoulder area, admittedly started stabbing officers who he saw respond to help Silva.

Moreover, the record indicates the relatively minor nature of Slankard's injuries was due, not to any lack of zeal on Manriquez's part, but to the officer's own ability to take defensive measures against Manriquez. According to Slankard's testimony, when he first noticed Avila had entered the programs office and then saw him start stabbing Silva, Slankard started to move towards Avila. But then, in his periphery vision, Slankard saw Manriquez approaching him with his weapon raised in a manner suggesting Manriquez was about to stab him. Slankard turned to face Manriquez and attempted to block

11.

Manriquez's swing by hooking his hand around Manriquez's arm. With the officer's hand hooked around his arm, Manriquez still managed to stab Slankard's neck and continued trying to stab Slankard after the officer punched him in the face. Slankard's testimony was thus consistent with Manriquez's own statements to investigators that he stabbed officers he saw responding to Avila's attack on Silva.

By all accounts, including Manriquez's own, he was an active participant in the April 3, 2008, attack on the correctional officers. With knowledge Silva was under direct attack and had been stabbed repeatedly by Avila, Manriquez not only tried to thwart other officers from aiding Silva by stabbing them, but apparently succeeded in keeping both Slankard and Cacciola occupied for an extended period of time by vigorously resisting their attempts to restrain him after he stabbed Slankard's neck.

On this record, even assuming Manriquez did not intend to kill any the officers or share the same level of enthusiasm displayed by Avila, Manriquez's conduct throughout the incident constituted overwhelming evidence that he acted with knowledge of the danger to, and with conscious disregard for human life, such that reasonable jurors could not have concluded that he committed the lesser offense of aggravated assault without committing the greater offense of aggravated assault by a life prisoner. Therefore, the trial court was under no duty to instruct the jury on the lesser included offense and its failure to do so is not reversible error.

### C.    *Imposition of restitution fine*

Appellants assert the restitution fine and corresponding parole revocation fine imposed against each of them must be reduced from $240 to $200. They contend the court imposed the $240 fine because it mistakenly believed it was the statutory minimum amount, based on the newly-enacted version of section 1202.4 which was inapplicable to their case. To the extent their challenge to the fine was forfeited by the failure of defense counsel to raise it below, appellants assert they received ineffective assistance of counsel. We reject these assertions.

12.

The record of appellants' sentencing hearing on December 11, 2012, reflects that the trial court followed the recommendation of the probation reports when it imposed against each appellant a $240 restitution fine pursuant to section 1202.4, subdivision (b), and imposed and suspended a $240 parole revocation fine pursuant to section 1202.45. The court did not comment when it imposed the fines, appellants did not object, and their probation reports did not address which version of section 1202.4 was being relied upon.

At the time appellants committed their offenses in April 2008, former section 1202.4, subdivision (b)(1) provided: "(b) In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. [¶] (1) The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense, but shall not be less than two hundred dollars ($200), and not more than ten thousand dollars ($10,000), if the person is convicted of a felony…."

Effective January 1, 2012, the calculation of restitution fines in section 1202.4, subdivision (b)(1) was amended as follows: "The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense, [but] shall not be less than *two hundred forty dollars ($240)* starting on January 1, 2012…." (Stats. 2011, ch. 358, § 1, italics added.)

Based on this amendment, appellants posit the court imposed the $240 restitution fine by erroneously relying on the amended version of section 1202.4, subdivision (b)(1), which was not applicable to crimes committed before January 1, 2012. Appellants assert the court's reliance on the newly-enacted version of the statute violates the prohibition against ex post facto law contained in the federal and state Constitutions.

"A restitution fine qualifies as punishment for purposes of the prohibition against ex post facto laws. [Citations.]" (*People v. Saelee* (1995) 35 Cal.App.4th 27, 30-31.) Appellants did not object to the court's imposition of the restitution fine or raise their

13.

ex post facto argument below. The rule of forfeiture is applicable to ex post facto claims, particularly where the alleged error could easily have been corrected if the issue had been raised at the sentencing hearing. (*People v. White* (1997) 55 Cal.App.4th 914, 917; *People v. Turrin* (2009) 176 Cal.App.4th 1200, 1207.)

In any event, the trial court imposed a restitution fine in this case that was well within the range of fines authorized at the time of appellants' commission of the offenses in April 2008. There is nothing in the record to support appellants' supposition that the court relied on the subsequent version of section 1202.4, subdivision (b)(1) when it imposed the $240 restitution fine. The court merely imposed the fine without comment. Since the restitution fine was in an amount authorized by the statute that was in effect at the time of appellants' commission of the offenses, and there is nothing in the record indicating the court imposed the fine pursuant to the amended version of the statute, appellants' ex post facto claim fails.

For the same reason, appellants' ineffective assistance of counsel claim also fails. "[T]o prevail on this ground [they] must prove that counsel's deficient performance resulted in prejudice. [Citation.]" (*People v. Quinn* (2001) 86 Cal.App.4th 1290, 1295; see *Strickland v. Washington* (1984) 466 U.S. 668, 687.) They must demonstrate from the record that there would have been a reasonable probability of a different result but for their attorneys' performance. (*People v. Quinn*, at p. 1295; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) As just discussed, appellants' assertion that the court relied on the wrong statute in imposing the $240 restitution fine is based on supposition. Appellants have failed to establish a reasonable probability that, but for the failure of defense counsel to object, the court would have imposed a restitution fine in a lower amount.

## D. *Correction of abstract of judgment*

Manriquez contends, the People concede, and we agree the abstract of judgment contains a clerical error regarding the sentence the trial court imposed for his convictions of aggravated assault by a life prisoner (§ 4500).

At the sentencing hearing, the trial court imposed consecutive terms of "life without the possibility of parole for 27 years" on counts 4, 5, and 6. The court's statement appears to reflect the language of section 4500, which proscribes punishment of "life without the possibility of parole for nine years."

Despite the reference to "life without the possibility of parole," the parties on appeal recognize the relevant language of section 4500 essentially provides for the imposition of a term of nine years to life, which the trial court tripled to 27 years to life for Manriquez's prior strike convictions. Thus, the court essentially sentenced Manriquez on counts 4, 5, and 6, to three consecutive terms of 27 years to life, for a total indeterminate term of 81 years to life.

However, the abstract of judgment incorrectly states that Manriquez received a sentence of life without the possibility of parole for his convictions. Thus, box No. 4 is checked, which indicates he was sentenced to state prison for an indeterminate term of "LIFE WITHOUT THE POSSIBILITY OF PAROLE on counts 4, 5, 6." Incongruously, below box No. 4, box No. 6.c. is also checked, which suggests he received an indeterminate term of life *with* the possibility parole consisting of "81 years to Life on counts 4, 5, & 6."

Accordingly, the abstract of judgment must be amended to correctly reflect that Manriquez was sentenced to three consecutive terms of 27 years to life on counts 4, 5, and 6, for a total indeterminate term of 81 years to life, and that his sentence includes the possibility of parole.

15.

### E. *Imposition of section 12022, subdivision (b)(1) enhancement*

The jury found true the allegation that Manriquez used a deadly and dangerous weapon within the meaning of section 12022, subdivision (b)(1), in his commission of count 5, which charged that he committed the crime of aggravated assault by a life prisoner against Slankard in violation of section 4500.  Based on the jury's finding, the court imposed a one-year enhancement in sentencing Manriquez on count 5.  We conclude the section 12022 enhancement was improperly imposed because Manriquez's use of a deadly weapon is an element of the underlying offense.

Section 12022, subdivision (b)(1) provides:  "A person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, *unless use of a deadly or dangerous weapon is an element of that offense*." (§ 12022, subd. (b)(1), italics added.)

Section 12022 thus provides the enhancement is improper where use of a deadly or dangerous weapon is an element of the offense.  Accordingly, it has been held that a sentence for violating section 245, which defines the crime of assault with a deadly weapon or by means of force likely to produce great bodily injury, may not be enhanced under section 12022, subdivision (b).  (*People v. McGee* (1993) 15 Cal.App.4th 107, 113 (*McGee*).)  Just as in section 245, use of a deadly weapon is an element of section 4500.  Indeed, the relevant language of the two statutes is identical and, as discussed above, section 245 is a lesser included offense of section 4500.  (*People v. Oppenheimer* (1909) 156 Cal. 733, 745.)

The jury here was instructed that it could find appellants violated section 4500 in two ways, by directly committing the crime or by aiding and abetting the other. Theoretically, therefore, it might be argued that the enhancement was permissible because use of a deadly weapon is not an essential element of the crime of aiding and abetting an assault with a deadly weapon.  However, the court's analysis in *McGee*,

16.

*supra*, 15 Cal.App.4th 107 persuades us otherwise. There, the defendant was charged with violating section 245, and a section 12022 enhancement was also alleged. (*McGee*, at pp. 112-113.) The trial court deleted the portions of the section 245 instructions relating to use of a deadly weapon, and the jury convicted the defendant of assault by means of force likely to produce great bodily injury and found true the section 12022 enhancement for personal use of a deadly weapon. (*McGee,* at p. 113.)

In holding the section 12022 enhancement was improperly imposed, the *McGee* court stated that section 245 defines only one offense, and that in determining whether use of a deadly weapon is an element of that offense, "the question is not simply whether, in the abstract, the section can be violated without using such a weapon. Rather, the conduct of the accused, i.e., the means by which he or she violated the statute, must be considered." (*McGee*, *supra*, 15 Cal.App.4th at p. 115.)

While it might be possible in the abstract for an aider and abettor to be found guilty of aggravated assault by a life prisoner without directly assaulting the victim and without directly using a deadly weapon, this is not what happened here. Manriquez committed the violation of section 4500 charged in count 5, by directly attacking Slankard and stabbing the officer in the neck with a shank. Because the use of a deadly weapon was an element of the underlying offense, the enhancement imposed on count 5 pursuant to section 12022, subdivision (b)(1) was improper and must be stricken.

## III. *Avila's Issues*

### A. *Denial of motion to replace defense counsel*

Avila contends the trial court abused its discretion in denying his pretrial motion to replace defense counsel because the record of the *Marsden* hearing established counsel was not adequately prepared for trial or familiar with the law governing the issues in this case. We disagree and conclude the court did not abuse its discretion in denying Avila's motion to replace counsel because, contrary to his assertions, Avila failed to make the requisite showing that he was entitled to appointment of new counsel.

17.

In a *Marsden* hearing, a defendant seeks to discharge his court-appointed counsel on the basis of inadequate representation. The trial court must allow the defendant to explain the basis of his claim and to relate specific instances of counsel's ineffectiveness. (*People v. Smith* (2003) 30 Cal.4th 581, 604.) "A defendant is entitled to have appointed counsel discharged upon a showing that counsel is not providing adequate representation or that counsel and defendant have been embroiled in such an irreconcilable conflict that ineffective representation is likely to result. [Citations.]" (*People v. Jones* (2003) 29 Cal.4th 1229, 1244-1245 (*Jones*).)

We review a denial of a *Marsden* motion for an abuse of discretion. (*Jones*, *supra*, 29 Cal.4th at p. 1245.) "Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would 'substantially impair' the defendant's right to assistance of counsel. [Citations.]" (*People v. Webster* (1991) 54 Cal.3d 411, 435.)

The trial court heard Avila's motion to replace defense counsel on September 25, 2012, shortly before the commencement of trial proceedings. We have reviewed the transcript of the *Marsden* hearing but need not recite all of the grounds urged by Avila below because his argument on appeal focuses on two issues; namely, defense counsel's refusal to file a *Pitchess*[2] motion and failure to conduct further investigation into potential inmate witnesses. His complaints in this regard amount essentially to a disagreement with counsel over tactical decisions. It is well established that a disagreement over tactical decisions will not entitle a defendant to a new attorney unless the defendant establishes that defense counsel's choice of tactics will result in ineffective assistance. (*People v. Hart* (1999) 20 Cal.4th 546, 604.) Reviewing the trial court's ruling based upon the record and claims presented at the time of the *Marsden* hearing, we conclude that Avila failed to demonstrate that the complained-of decisions of defense

---

**2** *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

18.

counsel would likely result in ineffective assistance and therefore the court did not abuse its discretion in denying his motion to replace counsel.

Under *Pitchess*, *supra*, 11 Cal.3d at pp. 537-538, a defendant is entitled to discovery of an officer's confidential personnel records if those files contain information that is potentially relevant to the defense. (See Evid. Code, §§ 1043-1045.) To exercise this right, a defendant must file a motion demonstrating good cause for the discovery which, if granted, results first in an in camera court review of the records and subsequent disclosure to the defendant of information "relevant to the subject matter involved in the pending litigation." (Evid. Code, § 1045, subd. (a).)

Noting the "'relatively low threshold'" for establishing good cause necessary to compel in camera review of an officer's personnel records (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019 (*Warrick*), Avila asserts defense counsel's explanation for refusing to file a *Pitchess* motion betrayed counsel's lack of legal knowledge and thus demonstrated the inadequacy of his pretrial representation of Avila. Specifically, defense counsel told the trial court that he refused Avila's persistent requests to file a *Pitchess* motion because, as he explained to Avila, although he could and would file a motion if grounds for one appeared, he had not found any basis for bringing a *Pitchess* motion in his review of the discovery received up to that point and had a duty to the trial court not to file frivolous motions.

On appeal, Avila asserts that defense counsel's explanation demonstrates a lack of legal knowledge concerning *Pitchess* motions because, according to Avila, counsel could easily have produced an affidavit sufficient to trigger in camera review of the officers' personnel records by "setting forth Avila's previous conflict with Silva and Slankard and their claim that Avila made a premeditated attack—countered by Avila's assertion that he acted in self-defense." Apparently presuming these records would have revealed that the officers had histories of falsifying reports and engaging in violence towards inmates, Avila asserts defense counsel's decision not to file a *Pitchess* motion resulted in

19.

ineffective assistance because "the jury was not permitted to hear evidence that went directly to the credibility of the self-defense case."

In addition to being highly speculative, Avila's argument is flawed because it is based on facts developed at trial but which were not presented to the trial court at the time of the *Marsden* hearing, when the burden was on Avila to show counsel's challenged tactical decisions would result in ineffective assistance. While Avila is correct that a low threshold is required to demonstrate good cause for in camera review of an officer's personnel files (*Warrick*, *supra*, 35 Cal.4th at p. 1019), Avila failed to meet even that minimal level in presenting a "specific factual scenario of officer misconduct." (*Id.* at p. 1025; see, e.g., *People v. Collins* (2004) 115 Cal.App.4th 137, 151 [affirming denial of *Pitchess* motion without in camera review where "defendant's declaration merely made general allegations of misconduct against [the officers] without alleging any facts that provided reason to believe the misconduct had occurred"].)

At the *Marsden* hearing, Avila made only general allegations challenging the veracity of the officers' reports of the April 3, 2008, incident; he did not specifically allege that there had been any "previous conflict" between him and Silva and Slankard leading up to the incident, or allege any facts that would have provided reason to believe their personnel files might contain something that would aid Avila's defense. For example, without identifying the officer, Avila indicated he disagreed with a statement by "one of the officers that alleges he was attacked" in which the officer claimed he had always treated MAC representatives, including Avila, with respect. However, Avila did not directly accuse the unidentified officer of falsifying his statement or offer any facts to refute the officer's claim regarding his respectful treatment of MAC representatives but simply told the court: "I have a different view of that, like I told [defense counsel]. It is not unusual for the MAC to be the targets of CDC ire because they're hearing us complain. That's where all this started at. All this started there." Avila did not explain what he meant by "CDC ire" or set forth any facts supporting his assertions suggesting it

was the impetus for the current incident. Avila did not specifically allege that Silva, Slankard, or any other individual correctional officer at Tehachapi had assaulted or harassed other inmates in the past for complaining about prison conditions, nor did he allege that any of the individual officers assaulted him in this incident for that reason.[3] Similarly, Avila made general allegations that the officers' reports describing him as running into the programs office were false and insisted he was "summoned" there. However, he did not specify how he was summoned or identify who summoned him. Avila did not allege, as he later testified at trial, that Silva summoned him by opening the door of the programs office and calling out to him in the law library, such that there would be reason to believe other inmates in the vicinity would have overheard Silva and be able to substantiate Avila's account.

Overall, Avila's remarks to the trial court indicate he believed *Pitchess* entitled him to discovery of officers' personnel records simply because he had a "different version of events" than theirs regarding the stabbing incident.[4] Under these circumstances, it would not have been unreasonable for defense counsel to conclude Avila's general allegations suggesting possible misconduct were insufficient to trigger in camera review of the personnel records of any of the officers involved in the incident on April 3, 2008, and that the court would likely deny a *Pitchess* motion as an unnecessary fishing expedition. Therefore, the reasons defense counsel provided for his refusal to file

---

[3] For the same reason, Avila did not demonstrate counsel was ineffective for failing to follow Avila's advice to seek records of the minutes of MAC meetings to try to identify inmates who could provide testimony refuting the officer's claim that he always treated MAC representatives with respect.

[4] For example, Avila told the court that "as I understand *Pitchess*, if I have a different version of events than the report states, then I may move for *Pitchess*." The trial court responded "Well, you've got to make some showing that perhaps there's a lack of credibility on the part of the officers or they write false reports, that they've done that in the past." In response, Avila simply insisted, "That's why the *Pitchess*."

21.

a *Pitchess* motion do not support Avila's assertions that he showed a lack of knowledge of the relevant law. [5]

Nor did defense counsel's explanations support Avila's assertions on appeal that counsel lacked understanding of the potential significance to the defense, with respect to issues of credibility and motive, if review of the officers' personnel records were to uncover evidence that Silva or Slankard had falsified reports or engaged in violence towards inmates in the past. Rather, in responding to Avila's complaints and comments by the trial court at the *Marsden* hearing, defense counsel appeared to recognize the theoretical significance of such evidence but explained to the court that, after reviewing all the discovery received up to that point, he had not found any evidence that would give him reason to believe the officers' personnel files would contain relevant documents.

In light of Avila's failure to make any specific allegations of misconduct on the part of the officers or to present any facts connecting the current incident with encounters he had with them in the past, it was not unreasonable for defense counsel to conclude that general allegations by Avila claiming correctional officers treated inmates with disrespect was not relevant to his claim of self-defense, which at that time counsel understood to

---

[5] We also reject Avila's claim that the following brief exchange between defense counsel and the trial court evidenced defense counsel's lack of adequate legal knowledge relevant to the case by showing counsel did not possess the "common knowledge" that the term "shank" used by the court referred to an inmate-manufactured knife:

"[DEFENSE COUNSEL]: [T]he case involved three subjects, and the allegation is that Mr. Avila and the co-defendant, Mr. Manriquez, allegedly used a sort of a makeshift metal object to attack—
"THE COURT: A shank?
"[DEFENSE COUNSEL]: No, a knife-type object—
"THE COURT: Okay.
"[DEFENSE COUNSEL]: —to attack the three officers in question."

The record reflects that the trial court interrupted defense counsel midsentence to interject the word "shank" and therefore it is possible counsel might not have properly heard or misunderstood the word the court used. In any event, the essential background facts of the case described by defense counsel were correct and, even if counsel was not familiar with the term "shank" at that time, this did not necessarily reflect he lacked knowledge of either the facts or law pertinent to the case.

center on what actually transpired once Avila was inside the programs office, and whether Avila or the officers attacked first.

For similar reasons, we conclude that Avila failed to demonstrate he was entitled to new counsel based on defense counsel's alleged failure to conduct an adequate investigation into potential inmate witnesses. In this regard, counsel explained that his review of all the discovery revealed that no inmates had witnessed what occurred inside the programs office. Counsel also indicated he did not think it would be fruitful to interview any of the inmates suggested by Avila, who did not witness the incident and therefore would not be able to provide any testimony substantiating his claim that the officers attacked him first before he used deadly force to defend himself.

Avila does not dispute the absence of inmate witnesses to what occurred inside the programs office but argues that defense counsel's explanation demonstrated the inadequacy of his pretrial representation by reflecting counsel's failure to recognize that the potential value of inmate witnesses did not depend on their being percipient witnesses. Avila posits that, by interviewing inmates who were present in the law library at the time of the incident, defense counsel could have identified inmate witnesses who would substantiate Avila's claim that he was "summoned" into the law library. However, as already discussed, Avila did not allege any specific facts at the *Marsden* hearing regarding how he was summoned to the programs office, which would provide reason to believe inmates in the library could substantiate Avila's claim.

Avila also asserts that defense counsel was ineffective for failing to investigate an inmate named Romero, whom Manriquez reportedly identified as being the person who "fashioned" the shanks involved in the incident, or an inmate named Gonzales, with whom Avila purportedly corresponded and had recently been "written up" for conspiring to commit a similar assault on correctional officers at Pelican Bay State Prison where Gonzales was housed. Avila suggests that these and other inmates could have testified to the fact that "fights between the corrections officers and Hispanic inmates were not

23.

limited to the Tehachapi" and thus provided "evidence of a state-wide conspiracy that would have been relevant to Avila's fear of being attacked."

Such evidence would appear to be relevant only if Avila's alleged fear of the correctional officers in this case was in some way informed by his knowledge of incidents of violence between correctional officers and Hispanic inmates occurring at other California prisons. However, Avila never alleged that his fear was based on such knowledge. Rather, his testimony at trial suggested that the extreme hostility he claimed to have experienced in response to filing administrative appeals was something unique to Tehachapi and the particular officers involved in the April 3, 2008, incident.

Nor is it clear how interviewing inmates, like Romero, who were allegedly linked to the two shanks used by Avila and Manriquez could have led to evidence helpful to Avila. Rather, it seems that discovery of further evidence showing that a number of different inmates were involved in the manufacture and placement of the weapons in the law library would have more of a tendency to prove their subsequent use by appellants to stab the correctional officers was part of preplanned attack than it would have a tendency to prove Avila stabbed the officers in self-defense. In short, we see no basis in the record to conclude that the trial court abused its discretion in denying Avila's *Marsden* motion.

### B.     *Response to jury question about moral turpitude*

Before Avila took the stand to testify in his own defense, the prosecutor informed the trial court that, if Avila opted to testify, the People would seek to introduce evidence of his prior felony convictions—including two convictions for murder—for impeachment purposes. As relevant to the issue Avila raises on appeal, the trial court granted defense counsel's request to "sanitize" the prior murder convictions by permitting them to be referred to only as felony convictions for "crimes involving moral turpitude" but only after warning counsel that jurors would "sometimes" ask what "moral turpitude" meant, requiring the court "to define that in some fashion, as either as the readiness to the evil

24.

[*sic*] which is the Court's finding in this case or perhaps the type of felony that may be considered for impeachment."

In accordance with the trial court's ruling limiting the introduction of prior conviction evidence for impeachment purposes, Avila testified that he was convicted of robbery in 1979, assault with a deadly weapon in 1984, and "felon[ies] involving moral turpitude" in 1997 and 1998. As the court previously anticipated, during deliberations, the jury sent the court a note asking the meaning of "moral turpitude." Over defense counsel's objection, the court responded by instructing the jury as follows: "Moral turpitude crimes are those that show a general readiness to do evil. The type of felony the jury may consider for impeachment purposes."

Avila now claims that, while the trial court's response might have constituted a correct statement of law, the court nonetheless violated his right to a fair trial by failing to limit the "readiness to do evil" language to the jury's assessment of his credibility and thus prejudicially led the jury to believe he had the propensity to commit crime. The People counter by asserting Avila's claim is forfeited under the invited error doctrine and lacks merit in any event. We agree with both of the People's assertions.

"[T]he doctrine of invited error operates to estop a party from asserting an error when the party's own conduct has induced its commission [citation], and from claiming to have been denied a fair trial by circumstances of the party's own making [citation]." (*People v. Lang* (1989) 49 Cal.3d 991, 1031-1032.)

The invited error doctrine is applicable here because the record shows defense counsel made a deliberate, tactical decision to confirm he still wanted Avila's prior murder convictions to be referred to as "crimes involving moral turpitude" after the court explicitly warned this might prompt the jury to ask for a definition and gave counsel an example of a definition the court might give in response. Counsel did not challenge the court's proposed definition, which was nearly identical to the response the court actually gave in response to the jury's note and which Avila now challenges on appeal.

25.

However, even if invited error was not present, we would reject Avila's claim on the merits. Section 1138 provides that if the jury "desire[s] to be informed on any point of law arising in the case,... the information required must be given ...." (§ 1138; see *People v. Beardslee* (1991) 53 Cal.3d 68, 97.) Thus, "a trial court is *required* to instruct a deliberating jury on its request 'on any point of law arising in the case.' [Citation.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 746, italics added.)

A trial court's answer to a jury question can be erroneous even if it is free of inaccuracies. In addition to avoiding incorrect statements of law, the court's answer must also "clear up any instructional confusion expressed by the jury. [Citations.]" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212, superseded by statute on another point as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.)

The trial court's answer to the jury's question was not inaccurate and it directly answered the question posed by the jury, which asked for the meaning of moral turpitude. During the trial, the term "moral turpitude" was mentioned only with regards to Avila's prior convictions, and the jury was specifically instructed that it could consider evidence of Avila's prior convictions only for purposes of assessing his credibility. Moreover, the court's definition of moral turpitude specifically referred to it as a crime that can be considered for *impeachment*. The record discloses no reason to conclude the court's response to the jury's note led the jury to disregard these court's instructions, which we must presume the jury followed in the absence of evidence to the contrary. Accordingly, we reject Avila's challenge to the court's response to the jury's note.

### C.    *Denial of motion to continue trial*

Early in the trial proceedings, Manriquez filed a motion to continue trial, which Avila subsequently joined, seeking additional time to investigate four inmates Manriquez had mentioned during his interviews with CDCR investigators but whose names and other identifying information, including their gang associations, were redacted in the reports of the interviews provided to the parties during discovery. The motion was

prompted by the trial court's recent discovery order requiring disclosure of the previously redacted identifying information of the inmates Manriquez mentioned in his interviews.

On October 11, 2012, trial court heard the defense motion to continue trial. During the hearing, the undisputed fact emerged that, despite the redactions in the reports of Manriquez's interviews, the names of the four inmates had been disclosed early on in the discovery process, and one of the four inmates was specifically identified in a list provided to the parties of inmates who were working in the law library at the time of the subject incident. In attempting to explain his failure to investigate the four inmates sooner, Manriquez's counsel conceded they had had the names of the four inmates "for years" but claimed their potential relevance and the need to investigate them only became apparent after the court's recent discovery order revealed them to be the inmates Manriquez had referenced during his interviews. After listening to the arguments of counsel, the trial court denied the motion, finding no good cause to continue the trial.

Avila now contends the trial court abused its discretion in denying the defense motion for a continuance needed to investigate documents relevant to the case, and that the denial deprived him of due process by forcing him to go to trial with "no evidence besides his own testimony to support his defense." We are not persuaded by Avila's arguments that the court's denial of a trial continuance requires reversal in this case.

Continuances in a criminal case may be granted only upon a showing of good cause. (§ 1050, subd. (e); *People v. Frye* (1998) 18 Cal.4th 894, 1012, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) A showing of good cause requires a demonstration that both counsel and the defendant have used due diligence in their preparations. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037.) "The determination of whether a continuance should be granted rests within the sound discretion of the trial court." (*People v. Sakarias* (2000) 22 Cal.4th 596, 646.) Absent a showing of abuse of discretion and prejudice to the defendant, the denial of a motion for continuance does not require reversal. (*People v. Samayoa* (1997) 15 Cal.4th 795, 840.)

27.

With respect to Manriquez, who originally brought the motion to continue trial, it is clear the court did not abuse its discretion in denying the motion because Manriquez failed to establish the use of due diligence in preparing for trial. Information about the four inmates at issue were, in the words of the trial court, "certainly known to Mr. Manriquez because they are certainly his own statements" which he made to investigators in April 2008. He failed, however, to provide a compelling reason for why he did not seek to investigate the inmates sooner but waited until the proverbial "eve of trial" in October 2012, to request a continuance for that purpose.

With respect to Avila, it is unnecessary to reach the question of whether the trial court abused its discretion in denying the motion to continue trial because, even assuming Avila was unaware of the potential significance of the four inmates mentioned in Manriquez's statements until the court's order requiring disclosure of their names, Avila cannot establish that he suffered any prejudice as a result of the denial of a continuance for purposes of investigating the four inmates. As the court observed at the time of the motion, Avila made no showing as to how such investigation "would lead to any relevant information in terms [of] his defense."

Avila's arguments on appeal also fail to explain specifically how the particular inmates, who were the focus of the motion below, could have made a difference to the outcome of his trial. He speculates that further investigation into these inmates *might have* led to the discovery of evidence of "similar incidents in other parts of the state" relevant to his alleged fear of the officers in this case, or the one inmate who was also a library worker "could [have] corroborate[d] his testimony that Silva called him into the office." However, at the time of the motion to continue trial, he presented no basis for the trial court to believe any of the four inmates could have provided such evidence.

However, even assuming the inmates could have provided such evidence, we are not persuaded it would have made a difference to the verdicts. As discussed above, Avila never claimed his alleged fear of the correctional officers in this case was in any way

based on his awareness of similar conflicts between correctional officers and inmates in other California prisons. Moreover, the jury's verdict finding him guilty of the lesser included offense of attempted voluntary manslaughter indicates the jury credited Avila's testimony that he was acting in self-defense (albeit imperfect) when he stabbed Silva and discredited Silva's contrary testimony. Therefore, it is unlikely that additional evidence which simply corroborated Avila's testimony that Silva called him into the programs office prior to attacking him would have made a significance difference to the jury's perception of Silva or its assessment of Avila's self-defense defense claim.

Finally, we reject Avila's attempt to frame the motion to continue trial as an "opportunity" for the trial court "to provide some kind of remedy" for problems in the discovery process Avila attributes to the CDCR. The motion to continue trial was not brought on this ground below. Therefore, Avila's general complaints about the protracted discovery process in this case do not establish either that the trial court abused its discretion in denying the motion or that the denial of the motion deprived Avila of a fair trial.

### D. *No cumulative error*

Avila contends the cumulative effect of his claims of error is such that his right to due process was denied and a reversal of his convictions is warranted. Having concluded there were no errors, we conclude there was no cumulative error that deprived Avila of due process. (*People v. Vieira* (2005) 35 Cal.4th 264, 294.)

## *DISPOSITION*

The convictions and true findings are affirmed. The trial court is directed to amend Manriquez's abstract of judgment to reflect he was sentenced on counts 4, 5, and 6, to consecutive terms of 27 years to life and his sentence includes the possibility of parole, and to strike the one-year Penal Code section 12022, subdivision (b)(1) enhancement imposed on count 5. The court is further directed to transmit certified copies of the amended abstract of judgment to all appropriate parties and entities.

_____
HILL, P.J.

WE CONCUR:


_____
CORNELL, J.


_____
GOMES, J.

30.